AO-106 (Rev: 06/09) Application for Search Warrant



# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

**FILED**

DEC 0 6 2022

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| In the Matter of the Search of<br>a volcanic gray Motorola cell phone Model number:<br>XT2113-5, and IMEI number: 354959221265209,<br>Currently Stored at FBI Tulsa Resident Agency, 8023<br>E63rd Place, Tulsa, Oklahoma | )<br>)<br>)<br>)<br>) |

Case No. 22-mj-791-SH

**FILED UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*):

See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___, there is now concealed (*identify the person or describe the property to be seized*):

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is (*check one or more*):

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1151, 1152, and 2241(a) | Aggravated Sexual Abuse by Force and Threat in Indian Country |
| 18 U.S.C. §§ 1151, 1152, and 1201(a)(2) | Kidnapping in Indian Country |
| 18 U.S.C. §§ 1151, 1152 and 113(a)(8) | Assault of an Intimate/Dating Partner by Strangling and Attempting to Strangle in Indian Country |

The application is based on these facts:

See Affidavit of SA Daniel Berardicurti, attached hereto.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Daniel Berardicurti, FBI
*Printed name and title*

Sworn to before me and signed ~~in my presence~~. *by telephone*

Date: 12/6/22

_____
*Judge's signature*

City and state:  Tulsa, Oklahoma

Susan Huntsman, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In the Matter of the Search of a volcanic gray Motorola cell phone Model number: XT2113-5, and IMEI number: 354959221265209, Currently Stored at FBI Tulsa Resident Agency, 8023 E63rd Place, Tulsa, Oklahoma | Case No. _____<br><br>**FILED UNDER SEAL** |

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Daniel Berardicurti, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant. I am a Special Agent with Federal Bureau of Investigation and have been since January 2019. I maintain a Juris Doctorate and an active membership in the Texas State Bar. Prior to being a Special Agent with the Federal Bureau of Investigation I was a police officer for

approximately three years.  During that time, I investigated numerous violent crimes as a first responder and drafted numerous search warrants.  Currently I am assigned to conduct investigations pursuant to the Federal Bureau of Investigation's Safe Trails Task Force, which focuses on a myriad of crimes occurring on Indian reservations to include sexual assaults of minors and production of child pornography.  I have received basic and on-the-job training in the investigation of cases involving sexual assaults of minors and production of child pornography.

3. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

4. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 18 United States Code, Sections 1151, 1152, and 2241(a) (Aggravated Sexual Abuse by Force and Threat in Indian Country); Title 18 United States Code, Sections 1151, 1152, and 1201(a)(2) (Kidnapping in Indian Country); and Title 18 United States Code, Sections 1151, 1152, and 113(a)(8) (Assault of an Intimate/Dating Partner by

2

Strangling and Attempting to Strangle in Indian Country) will be located in the
electronically stored information described in Attachment B and is recorded on the
device described in Attachment A.

### Identification of the Device to be Examined

5. The property to be searched is a volcanic gray Motorola cell phone Model
number: XT2113-5, and IMEI number: 354959221265209, hereinafter the "Device."
The Device is currently located at the FBI Tulsa Resident Agency Office located at
8023 E 63rd Place, Tulsa, Oklahoma.

6. The applied-for warrant would authorize the forensic examination of the
Device for the purpose of identifying electronically stored data particularly described
in Attachment B.

### Probable Cause

7. On May 4, 2022, Muscogee Nation Lighthorse Police ("MNLP") officers
responded to a domestic assault call for service at the River Spirit Casino.

8. Upon arrival, officers spoke with C.P., an enrolled member of the
Muscogee (Creek) Nation. C.P. informed officers that she and Andrew RECTOR
("RECTOR") were in an "off and on" relationship for several months. C.P. told
officers that RECTOR was supposed to come to her residence, XXXX 17th Street
South, Sapulpa, Oklahoma, on May 3, 2022, at approximately 9:30 p.m. to do "adult
things." C.P. told officers that RECTOR did not call or show up by the agreed upon
time, so she went to bed. C.P. told officers that at approximately 10:30 p.m.
RECTOR came into C.P.'s bedroom where she was lying with her daughter. C.P.

told officers that RECTOR told C.P. to take her daughter out of the room so he could get in bed with her; C.P. moved her child to the couch in the living area. C.P. told officers that RECTOR began yelling at her; C.P. told RECTOR to leave.

9. C.P. told officers that RECTOR then threatened to kill C.P.'s mother and brother if she did not "give him what he came for." C.P. told officers that RECTOR was referring to having sex with her as was discussed during an earlier conversation. C.P. informed officers she told RECTOR she no longer wanted to have sex with him because he was drunk and becoming irate. C.P. told officers RECTOR continued making threats to kill her family if she did not have sex with him. C.P. told officers she was in fear for her safety and the safety of her family, so she agreed to have sex with RECTOR. C.P. told Officers RECTOR went to the bathroom and she grabbed her cell phone and began recording.

10. C.P. told officers RECTOR exited the bathroom and grabbed her in a "reverse choke-hold" for several seconds. C.P. told officers she and RECTOR struggled. C.P. told officers that RECTOR strangled her at least five separate times. C.P. told officers that she was strangled until she lost consciousness. C.P. told officers that when she regained consciousness, she submitted to RECTOR, and they began having sex. C.P. told officers that when they were finished, RECTOR sat her cell phone and a handgun in front of her and said, "Either call the cops or kill me". C.P. told RECTOR she would not do either. C.P. left for work shortly thereafter.

4

11. On May 4, 2022, MNLP officers located RECTOR and arrested him. Officers seized a Motorola cell phone (model number: XT2113-5, IMEI number: 354959221265209) during RECTOR's arrest. The cell phone was placed in the MNLP evidence room.

12. On May 17, 2022, Special Agent ("SA") Tiffany Harrison, Task Force Officer Jeff Isenberg and I interviewed RECTOR at the Tulsa County Sheriff's Office. RECTOR was read his *Miranda* rights from the Federal Bureau of Investigation *Miranda* form. RECTOR agreed to speak and signed the form.

13. RECTOR stated he had known C.P. since he was ten years old. RECTOR stated they began dating in April and dated between one and two months. RECTOR stated their relationship started as sexual in nature and developed from there. RECTOR stated he and C.P. met for dinner on May 3, 2022. RECTOR stated C.P. had two margaritas and he had no alcoholic beverages.  RECTOR stated dinner ended because C.P. had to get her children.

14. RECTOR stated he received a text message from C.P. asking him to come to her house at 9:30 p.m. RECTOR stated he arrived at C.P.'s house at 10:00 p.m. RECTOR stated he went in the unlocked front door as was customary. RECTOR stated he went to C.P.'s bedroom and locked the door with a latch. RECTOR stated he did this to prevent C.P.'s children from coming into her room after C.P. and he had sex. RECTOR stated he and C.P. began having sex; C.P. was on top. RECTOR stated C.P. began performing oral sex on him and grabbed his testicles and squeezed. RECTOR stated C.P. did this because he flirted with a woman on Facebook.

5

RECTOR stated he slapped C.P. on the "butt" with his right hand and told her he was leaving.

15. RECTOR stated he started getting dressed. RECTOR stated he saw that C.P. had a knife in her right hand and was standing between him and the bedroom door. RECTOR stated he saw C.P. switch the knife to her left hand. RECTOR stated he saw C.P. posturing and motioning with the knife as if to cut herself. RECTOR stated he tried to walk around C.P. to exit the bedroom. RECTOR stated C.P. swiped at him with the knife; RECTOR retreated.

16. RECTOR stated he attempted to leave a second time and C.P. swiped at him again with the knife. RECTOR stated he grabbed C.P. from behind, his left hand on her wrist and his right arm around her neck. RECTOR stated he put some pressure on C.P.'s neck causing her to relax and drop the knife. RECTOR stated he had not been cut.

17. RECTOR stated he and C.P. then sat on the bed and began talking. RECTOR stated C.P. asked him if he was going to tell someone. RECTOR stated he told C.P. she needed to tell her mom so he would not have to tell someone. RECTOR stated he was going to leave when C.P. grabbed his left arm. RECTOR stated he stayed and had sex with C.P. again. RECTOR stated he slept in bed with C.P. until it was time for C.P.'s children to go to school. RECTOR stated C.P. took her children to school one at a time. RECTOR stated he took a shower and left.

18. RECTOR stated he had text messages from C.P. on his phone. He described his phone as being black and gray.

6

19. RECTOR stated that he hoped Lighthorse Police Department or David L. Moss had his phone because it is going to be vital to this investigation.

20. RECTOR stated that he and C.P. usually talked over the phone throughout the day. RECTOR stated there were messages from May 3, 2022, on his phone from C.P. asking him to come over to have sex.

21. RECTOR stated that the most important thing in the case is to get his cell phone. RECTOR further stated that the cell phone contains proof that C.P. consistently asked him to come over at or after 9:30 pm. Also, RECTOR stated his cell phone has messages from C.P. asking him to come over for sex.

22. On November 29, 2022, AUSA Julie A. Childress emailed RECTOR'S defense counsel, Debbie Jang, asking for RECTOR'S consent to search his cell phone. Debbie Jang emailed back on December 2, 2022, stating RECTOR will not consent to a search of his phone.

23. On May 27, 2022, SA Harrison and I interviewed C.P. C.P. stated she had known RECTOR for over twenty years. C.P. stated she began dating RECTOR on April 4th, 2022. C.P. stated RECTOR would come over to her house after her children were asleep almost every day. C.P. described RECTOR as being an alcoholic and as being irritable when he was drunk.

24. C.P. stated that on Tuesday, May 3, 2022, she and RECTOR agreed to being friends with benefits. C.P. stated they set a time for RECTOR to come over that night. C.P. stated she did not get a response from RECTOR at the designated time; C.P. went to bed. C.P. stated she forgot to lock the front door. C.P. stated her

7

daughter was in bed with her when RECTOR came into the house. C.P. stated RECTOR told her to put her daughter on the couch; she did. C.P. stated she told RECTOR to leave. C.P. stated RECTOR grabbed her phone and threw it in the closet. C.P. stated RECTOR said he wanted what they agreed on and then he would leave. C.P. stated RECTOR told her that "the babies are not going to wake up with momma." C.P. stated RECTOR then locked the door behind him.

25. C.P. stated she went into the bathroom and RECTOR followed her. C.P. stated RECTOR left the bathroom. C.P. stated when she came out of the bathroom, RECTOR put her in a headlock for a few seconds and then let her go. C.P. stated she fell to the floor and told RECTOR not to hurt her. C.P. stated RECTOR picked her up and put her on the edge of the bed. C.P. stated RECTOR told her, "Obey me and everything will be ok." C.P. stated she saw RECTOR facing the wall and talking. C.P. stated she asked RECTOR if he was talking to her. RECTOR said he was talking to God. C.P. stated RECTOR put her in another headlock.

26. C.P. stated RECTOR then went to the bathroom. C.P. stated she got her phone and began recording. C.P. stated she and RECTOR got into a struggle. C.P. stated RECTOR put her in a headlock and laid on top of her. C.P. stated she began to see black. C.P. stated RECTOR asked her, "Do you want to start going to funerals?" C.P. stated RECTOR told her he knew where her family lived and that her kids are not going to have a mother.

27. C.P. stated she and RECTOR continued struggling. C.P. stated RECTOR put her in another headlock. C.P. stated she hit RECTOR in the head with her hand

and they went to the ground. C.P. stated RECTOR squeezed her harder and she lost consciousness. C.P. stated she woke up to having urinated on herself. C.P. stated Rector put her on the bed again. C.P. stated RECTOR tried to spread her legs apart, but she kept them together. C.P. stated RECTOR hit her in the thigh.  C.P. stated she let RECTOR have what he wanted.

28. C.P. stated RECTOR put his penis in her mouth. C.P. stated this stopped when his penis became hard. C.P. stated RECTOR pulled C.P.'s legs apart and put his face between her legs. C.P. stated RECTOR licked the outside of her vagina. C.P. stated RECTOR then stuck his penis inside of C.P.'s vagina. C.P. stated RECTOR told her that she was going to have his babies and that he would kill the next person that took his babies. C.P. stated that RECTOR ejaculated inside of her. C.P. stated RECTOR got dressed and got a beer from the refrigerator. C.P. stated RECTOR then laid down in the bed and went to sleep.

29. C.P. stated she did not sleep. C.P. stated she told RECTOR he should leave before her children woke up; RECTOR refused to leave. C.P. stated her alarm went off at 7:00 a.m. and she got her children ready. C.P. stated she took her daughter to school and then came back. C.P. stated she got ready for work and then took her son to her ex-husband's residence. C.P. stated she then went to work and told her boss what happened. C.P. stated she reported the incident to MNLP. C.P. stated she had a SANE exam.

30. On November 16, 2022, MNLP Detective Bannon provided me with RECTOR's black Motorola cell phone. I entered the item into the Tulsa Resident

Agency's evidence room.

31. At all times relevant, C.P. was, and is, an enrolled member of the Muscogee (Creek) Nation.

32. At all times relevant, RECTOR, was, and is a non-Indian. I reviewed RECTOR's criminal history which showed his race as White. FBI Operational Support Technician Kaitlyn Collins received confirmation that RECTOR is non-Indian from the following five major Oklahoma tribes: Cherokee Nation, Muscogee (Creek) Nation, Chickasaw Nation, Choctaw Nation, and Seminole Nation.

33. At all times relevant, XXXX W 17st Street South, Sapulpa, Oklahoma is located within the external boundaries of the Muscogee (Creek) Nation and the Northern District of Oklahoma.

34. The Device is currently in the lawful possession of the FBI. It came into the FBI's possession in the following way: the Device was seized pursuant to RECTOR's arrest by MNLP. The Device was then placed into MNLP's property room. The Device was then provided to me on November 16, 2022, by MNLP Detective Bannon. The device was then placed into the FBI Tulsa Resident Agency's evidence room.

35. The Device is currently in storage at 8023 E 63rd Place, Tulsa, Oklahoma. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the MNLP.

**Technical Terms**

36. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store

11

their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The

Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include

global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

37. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.motorola.com/us/smartphones-motorola-one-5g-ace/p?skuId=537, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my

training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Electronic Storage and Forensic Analysis

38. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

39. I know that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities, including violations of Title 18 United States Code, Sections 1151, 1152, and 2241(a) (Aggravated Sexual Abuse by Force and Threat in Indian Country); Title 18 United States Code, Sections 1151, 1152, and 1201(a)(2) (Kidnapping in Indian Country), and Title 18 United States Code, Sections 1151, 1152, and 113(a)(8) (Assault of an Intimate/Dating Partner by Strangling and Attempting to Strangle in Indian Country). These photos are sometimes stored in their cellular phones and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages and emails are often used by two or more

persons to communicate information regarding illegal activities, between principals and co-conspirators of those crimes.

40. I know that cellular telephones are utilized by the majority of individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications like "Facebook Messenger," "Whatsapp," and "GroupMe." Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done through the use of Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include violations of Title 18 United States Code, Sections 1151, 1152, and 2241(a) (Aggravated Sexual Abuse by Force and Threat in Indian Country); Title 18 United States Code, Sections 1151, 1152, and 1201(a)(2) (Kidnapping in Indian Country); and Title 18 United States Code, Sections 1151, 1152, and 113(a)(8) (Assault of an Intimate/Dating Partner by Strangling and Attempting to Strangle in Indian Country).

41. Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during and after the commission of

16

offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to: telephone numbers, voice messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information. This information may be contained on the cellular telephone.

42. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

17

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

38. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

39. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

40. *Methods of examination*. In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the Device. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular device data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications. Consequently, often many communications in cellular device data that are relevant to an investigation do not contain any searched keywords.

## Conclusion

41. Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

42. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Daniel Berardicurti
Special Agent
FBI

Subscribed and sworn to [by phone] on December _6_, 2022.

THE HONORABLE SUSAN E. HUNTSMAN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to be Searched

The property to be searched is a volcanic gray Motorola cell phone, model number: XT2113-5, IMEI number: 354959221265209, hereinafter the "Device." The Device is currently located at FBI Tulsa Resident Agency, 8023 E 63rd Place, Tulsa, Oklahoma.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.



**ATTACHMENT B**

**Particular Things to be Seized**

All records on the Device(s) described in Attachment A that relate to violations of Title 18 United States Code, Sections 1151, 1152, and 2241(a) (Aggravated Sexual Abuse by Force and Threat in Indian Country); Title 18 United States Code, Sections 1151, 1152, and 1201(a)(2) (Kidnapping in Indian Country); and Title 18 United States Code, Sections 1151, 1152, and 113(a)(8) (Assault of an Intimate/Dating Partner by Strangling and Attempting to Strangle in Indian Country):

1. Records relating to communication with others as to the criminal offense(s) listed above; including incoming and outgoing voice messages; text messages; emails; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

2. Records relating to documentation or memorialization of the criminal offense(s) listed above, including voice memos, photographs, videos, and other audio and video media, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos, including device information, geotagging information, and information about the creation date of the audio and video media;

3. Records relating to the planning and execution of the criminal offense(s) above, including Internet activity, firewall logs, caches, browser history, and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

4. Application data relating to the criminal offense(s) listed above;

5. Threatening communications related to the criminal offense(s) listed above;

6. Evidence of user attribution showing who used or owned the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

7. All records and information related to the geolocation of the Device(s) and travel in furtherance of the criminal offense(s) listed above; and

8. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.